UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

            Plaintiff,

    vs.                                    REPORT AND RECOMMENDATION

Brent Michael Freeman,

            Defendant.            Crim. No. 10-68 (JRT/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


# I.  Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(A), upon the Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, and his Motion to Suppress Statements, Admissions, and Answers.  A Hearing on the Motions was conducted on April 19, 2010, at which time, the Defendant appeared personally, and by Caroline Durham, Assistant Federal Defender, and the Government appeared by Erika R. Mozangue, Assistant United States Attorney.

For reasons which follow, we recommend that the Defendant's Motions to Suppress be denied.[1]

## II. Factual and Procedural Background

In a two (2) Count Indictment, the Defendant is charged with one Count of Possessing Child Pornography, in violation of Title 18 U.S.C. §§2252(a)(4)(B), and 2252(b)(2), and one Count of Receiving Child Pornography, in violation of Title 18 U.S.C. §§2252(a)(2) and 2252(b)(1). The Indictment alleges that the crimes, which underlie Count One, occurred on or about July 9, 2007, and that the crimes, which underlie Count Two, occurred on or about December 7, 2006, with both crimes occurring in this State and District. As pertinent to those charges, and to the Motions now before us, the operative facts may be summarized as follows.[2]

---

[1]At the close of the Hearing, counsel for the parties requested leave to brief certain of the issues that arose during the Hearing, and leave was granted. The parties were to simultaneously file post-Hearing briefs on May 3, 2009, which the Government accomplished, while the Defendant advised that he was satisfied to submit the Motions on the Record. Accordingly we took the Motions under advisement on May 3, 2009. See, Title 18 U.S.C. §3161(h)(1)(D) and (H); Henderson v. United States, 476 U.S. 321, 330-32 (1986)(discussing the provision prior to the 2008 restructuring of the statute subparts); United States v. Blankenship, 67 F.3d 673, 676-677 (8th Cir. 1995)(same).

[2]Rule 12(d), Federal Rules of Criminal Procedure, provides that "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on
(continued...)

At the Hearing on the Motions, the Government adduced the testimony of Timothy D. Ball ("Ball"), who is a Special Agent with the Federal Bureau of Investigation ("FBI"). In addition, the Government introduced two (2) Search Warrants, both dated July 2, 2007. See, Government's Exhibits 1 and 2.

The first of the challenged Search Warrants was issued by a Magistrate Judge on July 2, 2007 (the "first Search Warrant"), see Government's Exhibit 1, and authorized a search of the Defendant's residence, which is located in Menahga, Minnesota (the "residence"), for internet billing and use records; records or other items that evidence the ownership of computer equipment; records that evidence the occupancy or ownership of the residence; any records or documents concerning a specific email address; any visual depictions of minors engaged in sexually explicit conduct, in any format or media, including undeveloped photographic film, photographs, magazines, videotapes, slides, and motion picture films; correspondence,

---

[2](...continued)
the record." As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion. Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require. See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991), cert. denied, 505 U.S. 1228 (1992); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

books, ledgers, or other records pertaining to the possession, receipt, distribution, transportation, or advertisement, of visual depictions of minors engaged in sexually explicit conduct, that were transmitted or received using a computer or other means of interstate or foreign commerce; and computers and all related equipment, including software and all forms of data storage devices. Id. at Attachment B. In addition, the Search Warrant authorized a forensic analysis of all computer equipment seized, which was to be focused on the items that we have just detailed. Id.

Attached to the Search Warrant was an Application, and Affidavit, that were executed by Ball, who averred that he has been employed with the FBI since February of 1997, and that he is responsible for investigating violations of Federal law, including those related to the manufacture, possession, and distribution, of child pornography. Id. at Affidavit. In his Affidavit, Ball set forth the reasons that caused him to believe that evidence of criminal activity would be found in the Defendant's residence. Id. In his Affidavit, Ball attested to the ways in which individuals, who engage in the collection of child pornography, can employ computers to produce, store, and distribute, images of child pornography, and to communicate with other like-minded individuals about such activities. Id. at ¶¶6-22.

Ball averred that the use of computers, and their related technology, has "revolutionized the way in which individuals interested in child pornography interact with each other," id. at ¶6, by making it "relatively inexpensive and technically easy to produce, store, and distribute child pornography," id. at ¶10. In addition, "this method of production does not leave as large a trail for law enforcement to follow as other methods." Id. A computerized depiction of child pornography is often stored as a GIF file, a JPEG file, a ZIP file, a SIT file, or an MPEG file. Id. at ¶18. According to Ball, the computer's ability to store images in a digital format makes them "an ideal repository for pornography." Id. at ¶15.

Child pornographers are known to store their images on their computers' hard drives, on floppy disks, or in external hard drives. Id. at ¶¶15 Ball attested that a computer's hard drive has the capacity to "store hundreds of thousands of images at very high resolution." Id. at ¶15. In addition, the transfer of images using a computer's magnetic storage, and a video capture board, can make evidence of child pornography difficult to discover, and evidence can then only be found with "careful laboratory examination of electronic storage devices." Id. Similarly, external hard drives "have the capacity to store hundreds of images, movies or other digital media,"

and "[t]he small size of the drives makes them compact and mobile in addition to making them easy to conceal." Id. at ¶16.

Ball also detailed how individuals, who are interested in child pornography, utilize computers, and online services, to communicate with, and distribute child pornography to, other like-minded individuals, via email, chat rooms, and messaging boards. Id. at ¶¶12-14, 17, 19-22. Those types of communication can be open and anonymous, and they have the capacity to maintain privacy, which is "ideal for the pornographer." Id. at ¶13. In particular, Ball attested that online communication allows users "to locate others of similar inclination and still maintain their anonymity," and to contact people "around the world in a relatively secure and anonymous format." Id. at ¶14. Once a collector of child pornography has made contact, "it is possible to send messages and graphic images to a trusted person with similar interests." Id. According to Ball, "[t]h[o]se advantages are well known, serving as a foundation of commerce between pornographers," id. at ¶4, and accordingly, "[w]ith the proliferation of commercial services and chat services, the computer has become one, if not the preferred, method of distribution of pornographic materials." Id. at ¶17.

In his Affidavit, Ball also explains how child pornographers make use of online message boards in order to view and post messages related to sharing child pornography via the Internet. Id. at ¶¶19-22. Ball attested that collectors and distributors of child pornography use message boards to share images, by posting messages, and by viewing and replying to each other's messages, which often include hyperlinks to online file hosting services, where message board users can view the pornographic images and videos while, at the same time, insulating the message boards from hosting child pornography. Id. at ¶¶20, 22. According to Ball, when a computer visits a website on the Internet, their Internet Protocol address ("IP address") can be employed to definitively identify the particular computer that was used because, "[w]hen a computer user visits a website on the internet, their IP address is visible to that website." Id. at ¶21. Law enforcement is capable of identifying a user's IP address to a specific household or residence, with the assistance of Internet Service Providers. Id.

As related by Ball, individuals who collect child pornography are generally "sexually attracted to children, [and] their sexual arousal patterns and erotic imagery focus, in part or in whole, on children." Id. at ¶23. Collectors of child pornography "express their attraction to children through the collection of sexually explicit

materials involving children as well as other seemingly innocuous material related to children." Id. In addition, those individuals' "overriding motivation * * * may be to define, fuel, and validate [their] most cherished sexual fantasies involving children." Id. at ¶24.

According to Ball, "[c]hild pornography collectors almost always maintain and possess their material in the privacy and security of their homes or some other secure location such as their vehicle(s) where it is readily available." Id. at ¶27. A child pornographer's collection may include "photographs, magazines, narratives, motion pictures, video tapes, books, slides, drawings, computer images or other visual media," id. at ¶27, and, "[b]ecause the collection reveals the otherwise private sexual desires and intent of the collector and represents his most cherished sexual fantasies, the collector rarely, if ever, disposes of the collection." Id. at ¶28. As such, a collection of child pornography tends to increase over time, and collectors "treat the materials as prized possessions and are especially unlikely to part with them." Id. Moreover, "even if a child pornography collector does delete files from his hard drive or other electronic media, a computer expert can still retrieve those files using forensic tools." Id.

Turning to the investigation of the Defendant, Ball recounted that, on December 7, 2006, the National Center for Missing and Exploited Children ("NCMEC") received a report, from Yahoo, on its Cybertipline, that an individual with the email address freeman@wcta.net, and using the screen name free42069, had posted images of child pornography on photos.yahoo.com/free42069. Id. at ¶29. At that time, Yahoo also produced sixty-six (66) images from the site. Id. Thereafter, on December 18, 2006, Agent Alicia Baumann ("Baumann") served an administrative subpoena on Yahoo, which requested the account, and subscriber information, for photos.yahoo.com/free42069. Id. at ¶30. Yahoo provided the following information:

| | |
|---|---|
| Alternate email: | freeman@wcta.net |
| Registration: | 216.189.131.230 (WHOIS = WCTA) on 12/17/2005 at 00:31:22 GMT |
| Last Login: | 216.189.138.4 (WHOIS = WCTA) on 11/18/2006 at 03:14:42 GMT (GMT+0000) |

Id.

Based upon the IP addresses provided by Yahoo -- namely, 216.189.131.230, and 216.189.138.4 -- in response to the administrative subpoena, a domain dossier search was performed, which disclosed that those IP addresses belonged to the West Central Telephone Association ("WCTA"). Id. at ¶32.

Then, on January 16, 2007, Baumann served an administrative subpoena on WCTA, which requested the account and subscriber information for the email address freeman@wcta.net., and for the IP Addresses provided by Yahoo. Id. at ¶¶31, 33. WCTA reported that the IP addresses, and the email account, were registered to the Defendant, and that the Defendant reported a residence, which was located on Juniper Avenue, in Menahga, Minnesota. Id. at ¶¶31, 33. An AutoTrack search was conducted for the Defendant in Menahga, Minnesota, which disclosed that the Defendant resided at the same address as had been reported by WCTA, which was located on Juniper Avenue, in Menahga. Id. at ¶34.

As noted, Yahoo produced the files that reportedly contained the child pornography, in connection with its Cybertip to NCMEC, and those images were reviewed for known victims of child pornography, through the Child Victim Identification Program ("CVIP"). Id. at ¶35. CVIP reported that ten (10) of the images, which had been produced, depicted identified child victims, ranging in age from three (3) to eight (8) years old, who were engaged in sexually explicit conduct with each other, and with adults. Id. at ¶35. In particular, those images were described as follows:

a.	img.464.jpg depicts an approximately 5-7 year old female orally copulating an adult male penis. The child in this image had been identified by the United States Immigration and Customs Enforcement.

b.	img.86.jpg depicts an approximately 7-8 year old female posing nude. The child in this image had been identified by the Federal Bureau of Investigation.

c.	img.75.jpg depicts two small females approximately 6-7 years of age orally copulating an adult male penis. The children in this image had been identified by the Pierce County Sheriff's Department, Pierce County, Washington.

d.	img.417.jpg depicts a four picture collage of a nude, approximately 3-4 year old female orally copulating an adult male penis. The child in this image had been identified by the Kennewick Police Department, Kennewick, Washington.

Id.

On April 5, 2007, a database check of the Minnesota Department of Motor Vehicles disclosed that the Defendant was presently residing at the same Menahga residence, which was located on Juniper Avenue, as had been identified by the WCTA. Id. at ¶37.

Ball averred that, on that same date, he drove by the Menahga residence, at which time, he observed a white Jeep Cherokee with Minnesota license plate MGN

688. Id. at ¶36. Ball also attested that, on that same date, he confirmed with the Minnesota Department of Motor Vehicles, that license plate MGN 688 was registered to the Defendant, and that the Defendant's residence was located at the Juniper Avenue address, in Menahga, Minnesota. Id. Based upon the foregoing facts, Ball expressed his opinion that contraband, evidence, and the fruits and instrumentalities of criminal activity -- namely, the knowing distribution and possession of child pornography -- would be found at the Defendant's Menahga residence.[3] As noted previously, on July 2, 2007, a Magistrate Judge signed the Search Warrant, which authorized a search of the Defendant's residence, and which required that the search be completed on or before July 12, 2007.

The Return, which was attached to the Search Warrant, discloses that the search was executed on July 9, 2007, at 2:29 o'clock p.m. Id. at Return. The Return reveals that the FBI seized a number of items, which were obtained from a computer desk that was located in the northeast bedroom of the residence, including the following: computer equipment, including a router, a computer tower, computer monitors, a keyboard, a scanner, an AC adaptor, speakers, computer wires, and power cords;

---

[3]The Menahga residence is described with particularity in Attachment A to the Search Warrant.

numerous discs, CDs, and CD-ROMs; handwritten notes containing web addresses; receipts; and a note containing an email address, which was seized from the dresser in the northeast bedroom. Id. In addition, the FBI seized two (2) VHS tapes from the residence, which were labeled "2 Hour Babysitter Vol. 1," and "At Camp Meeting 1999, Baker Family." Id.

The second Search Warrant was issued by the same Magistrate Judge, in this District, on July 2, 2007, shortly after the first Search Warrant was issued. See, Government's Exhibit 2. The second Warrant authorized a search of the website located at photos.yahoo.com/free42069, which is, in turn, controlled by Yahoo Inc., headquartered in Sunnyvale, California, to be conducted on or before July 12, 2007. Id. In particular, the Search Warrant directed Yahoo to "deliver to law enforcement" records and information, including all emails, that are stored or contained in, or on behalf of photos.yahoo.com/free42069, the Defendant, or free42069 (the "Yahoo accounts"); transactional information associated with the Yahoo accounts, including log files, dates, times, and methods of connecting to Yahoo's computers, the ports accessed, dial-up numbers accessed, purchases made, websites visited, and services or information accessed through personalized home or MyYahoo! webpages; and business records and subscriber information for any Yahoo subscribers who sent

messages to, or received messages from, the Defendant or the Yahoo accounts. Id. at Attachment A.

In addition, upon receiving that data and information from Yahoo, the Search Warrant authorized the Government to seize all records or information relating to email communications referencing or relating to images of children engaged in sexually explicit conduct; communications that refer to the sexual exploitation of children; and information related to sending, receiving, producing, storing, or possessing, images of children engaged in sexually explicit conduct. Id. The Search Warrant was directed at seizing that information from December 17, 2005, through the date that the Search Warrant was executed. Id.

In support of the second Search Warrant, Ball also submitted an Application and Affidavit, which set forth the reasons that caused him to believe that evidence of criminal activity would be found in the Yahoo accounts. Id. at Affidavit. Ball averred that, as a Special Agent with the FBI, he had received training in the investigation of computer and computer-related crimes, and crimes involving the sexual exploitation of children. Id. at ¶2.

According to Ball, Yahoo operates an email service through its website at www.Yahoo.com, that is available free of charge to internet users. Id. at ¶3(a). Ball

attested that, in order to subscribe, individuals must provide basic information, such as their name, gender, zip code, and other personal and biographical information. Id. Once they have completed the registration process, individuals can access their email accounts on servers, that are maintained or owned by Yahoo, from any computer with Internet access. Id.

In his Affidavit, Ball explained that Yahoo maintains electronic records which pertain to account access, email transactions, and account applications. Id. at ¶2(b). Emails that are sent to Yahoo subscribers are stored in their mailbox, until such time as that subscriber deletes the email, or the subscriber's mailbox exceeds storage limitations. Id. at ¶2(c). As related by Ball, if neither of those events occurred, a message can remain on the Yahoo server indefinitely, provided that the user accessed their account periodically. Id. at ¶2(c). With respect to emails sent by a subscriber, Yahoo's users have the option of saving a copy of the emails sent to other individuals and, if the sender chooses to save those emails, copies of sent email messages can also remain on Yahoo's system indefinitely. Id. at¶2(d). Ball attested that, if the recipient of the email message is also a Yahoo user, that message would remain on Yahoo's server until such time as the recipient deleted it, or the account reached or exceeded the account size limitations. Id.

In addition, a subscriber can store files, including emails and image files, on the servers that are maintained or owned by Yahoo. Id. at ¶2(e). Ball detailed how Yahoo provides subscribers the opportunity to access their accounts through a personalized home webpage, which is known as a "MyYahoo!" page. Id. at ¶2(f). Ball also described the Government's authority to access the content of electronic communications, and the related transactional and subscriber information, without providing notice to the subscriber. Id. at ¶¶4-8.

In further support of the second Search Warrant, Ball related the same details, as to the investigation into the tip made to NCMEC on December 7, 2006, and the resulting investigation of the Defendant, that had been contained in the first Search Warrant, which need not be recounted again. Based upon that information, Ball reported that it was his opinion that evidence, and the fruits and instrumentalities of child pornography crimes, would be found on the computer systems that were owned, maintained, or operated, by Yahoo, with respect to the accounts in question.

During the course of the Hearing, Ball was also questioned about his past experience in questioning witnesses, in both custodial and noncustodial interviews. In that respect, Ball related that he was assigned to investigate the Defendant, and that he participated in the execution of the first Search Warrant, on July 9, 2007. Ball

averred that he arrived at the Defendant's residence in Menahga, Minnesota, during the daytime hours, but that he couldn't remember exactly at what time of day the Search Warrant had been executed. In addition to Ball, there were four (4) other law enforcement officers at the scene, including Special Agent Asher Silkey ("Silkey"), Special Agent John Patrick Egelhof ("Egelhof"), Special Agent Robert P. Woldt ("Woldt"), and an unknown Menahga Police Officer. According to Ball, the FBI's standard procedure for the execution of a Search Warrant is to have officers on all sides of the property prior to entering the residence, although he could not recall if that was done with respect to the execution of the Search Warrant at the Defendant's residence.

Ball related that he knocked on the door to the Defendant's residence, and announced who he was. When the Defendant answered the door, Ball advised him that he had a Federal Search Warrant for the Defendant's residence. Upon entering the residence, Ball advised the Defendant that he was free to leave the residence while law enforcement executed the Search Warrant. The Defendant, who was the only person present at the time, told Ball that he would rather stay at the residence while the Search Warrant was being executed.

While at the residence for the execution of the Search Warrant, Ball asked the Defendant if he would be willing answer some questions. Ball also informed the Defendant that he did not have to answer any questions, and that he was free to leave at any time. In response, the Defendant agreed to an interview, and stated that he wanted to assist in the investigation, and wanted to tell the truth.

Ball testified that he did not advise the Defendant of his <u>Miranda</u> rights, see, <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), because the Defendant was not under arrest, nor in custody, at the time of the interview. Ball, Silkey, and the Menahga Police Officer, were present in the living room for the interview, while Egelhof and Woldt were not present, as they were still searching other parts of the residence. According to Ball, the Defendant was not handcuffed, and Ball and Silkey were in casual clothes. However, Ball believed that he may have been wearing his raid vest during the interview. Although Ball acknowledged that they were armed, he could not recall whether their weapons were visible.

Ball related that he asked most of the questions, and that the tone of the interview was conversational. According to Ball, the Defendant appeared to be nervous, although he also appeared to be clearheaded, and he seemed to understand who they were, and what the questions were about. Ball further testified that, during

the course of the interview, neither he, nor Silkey raised their voices, they did not yell at the Defendant, they did not threaten the Defendant, or make any promises to him.

According to Ball, during the course of the interview, the Defendant asked if he should get an attorney. In response, Ball stated that he could not give the Defendant legal advice, but if he thought that he needed a lawyer, that was his right. Ball averred that the Defendant did not ask for an attorney, and that the Defendant agreed to continue with the interview. The Defendant did not raise the issue of a lawyer at any other time during the interview. Ball testified that, at one point during the interview, the Defendant stated, "I just hung myself, I'm going to go to jail."

According to Ball, the interview lasted approximately fifteen to twenty minutes and, following the interview, law enforcement left the Defendant's residence, and the Defendant, who was not placed under arrest at that time, remained by himself at his residence. Prior to leaving, the Defendant was given a copy of the Search Warrant, and an inventory of the items that had been seized pursuant to the Search Warrant.

The Defendant has asked us to review the Search Warrants upon their "four corners," in order to determine whether they were supported by probable cause, or contained any other constitutional defects. Second, we are asked to review the Defendant's statement, which was made at the time of the search, for constitutional

defects.[4]  We first examine the two (2) Search Warrants, and then proceed to the legitimacy of the Defendant's statement to law enforcement.

## III.  Discussion

A.    The Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure.

1.    Standard of Review.  In the issuance of a Search Warrant, the Fourth Amendment dictates that an impartial, neutral, and detached Judicial Officer, will assess the underlying factual circumstances so as to ascertain whether probable cause exists to conduct a search, or to seize incriminating evidence, the instrumentalities or fruits of a crime, or contraband.  See, Warden v. Hayden, 387 U.S. 294 (1967); United States v. Johnson, 64 F.3d 1120, 1126 (8th Cir. 1995), cert. denied, 516 U.S. 1139 (1996).  In order to find probable cause, it must be demonstrated that, in light of all the circumstances set forth in the supporting Affidavit, there is a fair probability that contraband, or evidence of a crime, will be found in a particular,

---

[4]As we have noted, the Defendant requested leave to submit a post-Hearing brief, but later advised that he would be submitting the issues without further briefing. See, Docket No. 33.  Moreover, during the course of the Hearing, the Defendant did not specifically particularize any purported deficiencies in the Warrants, or in the process of obtaining evidence, or the Defendant's statement, in this case.  Of course, our obligation is to independently assess the issues, which are raised by the factual circumstances of the case, to conduct our own analysis of the issues presented, and we have adhered to that practice in reaching the Recommendations we make.

designated place. See, <u>United States v. Gladney</u>, 48 F.3d 309, 312 (8th Cir. 1995); <u>United States v. Tagbering</u>, 985 F.2d 946, 949 (8th Cir. 1993). For these purposes, probable cause is "a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules." <u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983); see also, <u>Ornelas v. United States</u>, 517 U.S. 690, 695-696 (1996).

"Search warrant '[a]pplications and affidavits should be read with common sense and not in a grudging, hyper technical fashion.'" <u>United States v. Ryan</u>, 293 F.3d 1059, 1061 (8th Cir. 2002), quoting <u>United States v. Goodson</u>, 165 F.3d 610, 613 (8th Cir. 1999), cert. denied, 527 U.S. 1030 (1999). In conducting such an examination, the Court should review the Affidavits as a whole, and not on a paragraph-by-paragraph basis. See, <u>United States v. Anderson</u>, 933 F.2d 612, 614 (8th Cir. 1991); <u>Technical Ordnance, Inc. v. United States</u>, 244 F.3d 641, 649 (8th Cir. 2001), cert. denied, 534 U.S. 1084 (2002).

Moreover, the reviewing Court must not engage in a <u>de novo</u> review but, rather, should accord great deference to the decision of the Judicial Officer who issued the Warrant. See, <u>United States v. Maxim</u>, 55 F.3d 394, 397 (8th Cir. 1995), cert. denied, 516 U.S. 903 (1995); <u>United States v. Curry</u>, 911 F.2d 72, 75 (8th Cir. 1990), cert.

denied, 498 U.S. 1094 (1991). This mandated deference to the determination of the issuing Judicial Officer is consistent with the Fourth Amendment's sound preference for searches that are conducted pursuant to Warrants. See, <u>Illinois v. Gates</u>, supra at 236.

      2.   <u>Legal Analysis</u>.   Since they involve somewhat different considerations we analyze each of the two (2) Search Warrants separately.

      a)   <u>The First Search Warrant: The Defendant's Residence</u>.

      Since no challenge has been made to the execution of the first Search Warrant, we focus our attention on the "four corners" of the Warrant, in order to determine if probable cause was shown for its issuance, and if any fatal defect would justify the suppression of any evidence secured by its execution. Our review of the Warrant confirms the appraisal of the issuing Judicial Officer, that ample probable cause supported the issuance of that Warrant, and further, that the Warrant was not otherwise fatally defective.

      We first consider whether the information, which was contained in the Affidavit of Ball, was impermissibly stale at the time that the Search Warrant was issued. "It is axiomatic that probable cause must exist at the time of the search and not merely at sometime earlier." <u>United States v. Kennedy</u>, 427 F.3d 1136, 1141 (8th Cir. 2005),

citing <u>United States v. Formaro</u>, 152 F.3d 768, 771 (8th Cir. 1998); see also, <u>United States v. Ozar</u>, 50 F.3d 1440, 1446 (8th Cir. 1995), cert. denied, 516 U.S. 871 (1995). Therefore, a lapse of time, between the observations of a witness and the issuance of a Search Warrant, like a delay in executing a Search Warrant, "may make probable cause fatally stale." <u>United States v. Maxim</u>, supra at 397 [quotations omitted].

"There is no bright-line test for determining when information is stale," and the passage of time, alone, is "not always the controlling factor," as other factors, such as "the nature of the criminal activity involved and the kind of property subject to the search," are also relevant to the inquiry. <u>Id.</u>, quoting <u>United States v. Koelling</u>, 992 F.2d 817, 822 (8th Cir. 1993), and <u>United States v. Rugh</u>, 968 F.2d 750, 754 (8th Cir. 1992); see also, <u>United States v. Kennedy</u>, supra at 1141; <u>United States v. Chrobak</u>, 289 F.3d 1043, 1046 (8th Cir. 2002). As but one example, when the Affidavit alleges an "ongoing, continuous criminal enterprise, the passage of time between the receipt of information and the search becomes less critical in assessing probable cause." <u>United States v. Rugh</u>, supra at 754. Therefore, in our analysis, we must not "simply count[] the number of days between the occurrence of the facts supplied and the issuance of the affidavit," but must consider any passage of time "in the context of a specific case and the nature of the crime under investigation." <u>United States v.</u>

- 23 -

Maxim, supra at 397-398 (upholding Warrant, which was based upon four-month-old information that the defendant possessed firearms, because firearm enthusiasts tend to retain their weapons for long periods of time), quoting United States v. Koelling, supra at 822.

We find that the information, which provided a basis for the first Search Warrant, was not fatally stale.  While it is true that many of the facts, which are recited in Ball's Affidavit, date back as far as to December of 2006, which was approximately seven (7) months prior to the Application for the Search Warrant, we must consider the "nature of the criminal activity involved and the kind of property subject to the search."  Id. at 397, citing United States v. Rugh, supra at 754.  In particular, we note that "the lapse of time is least important * * * when the [evidence of criminal activity] is not likely to be destroyed or dissipated."  United States v. Horn, 187 F.3d 781, 786 (8th Cir. 1999), cert. denied, 529 U.S. 1029 (2000).

Here, Ball attested, that individuals who collect child pornography are unlikely to dispose of their collections, and that their collections generally grow over time. Moreover, the Courts have consistently held that Search Warrants, which issued after many months had passed, are not impermissibly stale in cases of child pornography. See, United States v. Chrobak, supra at 1046 (where the evidence supported that child

pornographers generally retain their pornography for extended periods of time, information establishing its presence in the home three (3) months earlier was not stale); United States v. Horn, supra at 787 (finding that, if an individual had received child pornography, it would likely still be in that individual's possession three (3) or four (4) months later); United States v. Rugh, supra at 753-54 (finding a good-faith reliance on a Warrant, which was based upon sixteen (16) month old information that the defendant possessed child pornography, because "pedophiles typically retain child pornography for a long time"); United States v. Estey, 595 F.3d 836, 839-840 (8th Cir. 2010)(holding that probable cause was not impermissibly stale where information linked defendant's residence with child pornography five (5) months before search warrant issued), Petition for Cert. filed, Case No. 09-10326 (April 19, 2010); United States v. Lemon, 590 F.3d 612, 614-615 (8th Cir. 2010)(holding that eighteen (18) month interval, between evidence linking the defendant to child pornography, and the Warrant application, did not render the information stale where the defendant had traded a significant amount of child pornography, and the IP address, and screen name at issue, were still in use), Petition for Cert. filed, Case No. 09-10170 (April 7, 2010); United States v. Newsom, 402 F.3d 780, 783 (7th Cir. 2005)("Information a year old is not necessarily stale as a matter of law, especially where child pornography is

concerned."), cert. denied, 546 U.S. 1224 (2006), citing United States v. Lacy, 119

F.3d 742, 745 (9th Cir. 1997), cert. denied, 523 U.S. 1101 (1998)(finding that

information ten (10) months old was not stale because "the [agent] explained that

collectors and distributors of child pornography value their sexually explicit materials

highly, 'rarely if ever' dispose of such material, and store it 'for long periods' in a

secure place, typically in their homes."); United States v. Irving, 452 F.3d 110, 125

(2nd Cir. 2006)("When a defendant is suspected of possessing child pornography, the

staleness determination is unique because it is well known that 'images of child

pornography are likely to be hoarded by persons interested in those materials in the

privacy of their homes.'"), quoting United States v. Lamb, 945 F. Supp. 441, 460

(N.D.N.Y. 1996)(citing cases); United States v. Rabe, 848 F.2d 994, 995-97 (9th Cir.

1988)(finding that child pornography, which was sent to the defendant two (2) years

prior to the issuance of a Search Warrant, established probable cause when supported

by recent correspondence describing the defendant's collection); United States v. Hay,

231 F.3d 630, 636 (9th Cir. 2000), cert. denied, 534 U.S. 858 (2001)(six (6) month

time period, between the internet transmission of child pornography, and the

application for Search Warrant, did not render the transmission evidence insufficient

to support a finding of probable cause that evidence of child pornography was still

stored on the defendant's computer); <u>United States v. Diaz</u>, 303 F. Supp.2d 84, 90-91

(D. Conn. 2004)(sixteen (16) month delay did not render the evidence of child

pornography stale).

Moreover, as the Court observed in <u>United States v. Toups</u>, 2007 WL 433562

at *4 (M.D. Ala., February 6, 2007):

> Further bolstering the conclusion that the staleness
> calculation is unique when it comes to cases of internet
> child pornography is the images and videos stored on a
> computer are not easily eliminated from a computer's hard
> drive. The mere deletion of a particular file does not
> necessarily mean that the file cannot later be retrieved. See,
> e.g., United States v. Eberle, No. CRIM. 05-26, 2006 WL
> 1705143, at *1 (W.D. Pa. June 15, 2006)(noting that even
> when a computer has been "wiped," where "all files and
> data associated with a prior user from a hard drive [are
> deleted]," the data may still be retrieved through forensic
> procedures); United States v. Fazio, 1:05CR00014ERW
> (LMB), 2006 WL 1307614, at *9 (E.D. Mo. May 9, 2006)
> ("Even when * * * files have been 'deleted,' they are not
> really permanently removed from the computer but can be
> recovered months or years later.").

Here, Ball averred that, even if the Defendant had deleted the child pornography from

his computer, or other digital storage devices, a computer expert could be able to

retrieve those files using forensic tools. As a consequence, we find that a delay of

approximately seven (7) months did not render the information in Ball's Affidavit impermissibly stale.

Moreover, after considering the totality of the circumstances, and after applying a practical, common sense reading to Ball's Affidavit, we find that the Magistrate Judge, who issued the Warrant in question, was provided with information that established a reasonable likelihood to believe that a search      of the Defendant's residence would reveal evidence of criminal activity that was related to child pornography. Here, Ball's Affidavit recounts the details of its investigation, and the facts underlying the tip that led to the discovery, that child pornography had been posted or stored on the Yahoo accounts in question, which was  registered to IP addresses, which were, in turn, registered to the Defendant; that those files contained images of known child victims engaged in sexually explicit conduct; that, as of April 5, 2007, motor vehicle records disclosed that the Defendant still resided at the same address that was on record with the Internet Service Provider; and that a vehicle registered to the Defendant was parked outside that same residence. Given those facts, we find that Ball's Affidavit established that there was a fair probability that evidence of criminal activity would be found at the Defendant's residence. See, United States v. Anderson, 2007 WL 2908172 at *2 (D. Minn., October 2, 2007)("If

a defendant is implicated in distribution of child pornography on the internet and accesses the internet from the home, there is also a fair probability that such contraband will be found there.")[citing cases].[5]

In addition, we find nothing in this Record to dispute that law enforcement acceptably established a nexus between the Defendant, and the offending Yahoo accounts, or between the Defendant and the residence, based upon the information

---

[5]Although we recognize that some of the statements, which were included in Ball's Affidavit, appear to be based upon the observations of other law enforcement personnel, "probable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication." United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003)cert. denied, 541 U.S. 1081 (2004), quoting United States v. Horne, 4 F.3d 579, 585 (8th Cir. 1993), cert. denied, 510 U.S. 1138 (1994); see also, Doran v. Eckold, 409 F.3d 958, 965 (8th Cir. 2005), cert. denied, 546 U.S. 1032 (2005).

Moreover, the Defendant does not explicitly contend that the Affidavit, which was proffered in support of the first Search Warrant, failed to sufficiently describe the images that were disclosed by Yahoo. In any event, we find no responsible basis for such an argument on this Record, given the detailed descriptions that are contained in the Affidavit of Ball. See, United States v. Chrobak, 289 F.3d 1043, 1045 (8th Cir. 2002)(reiterating that, in order to make an "independent judicial determination," that the images identified in a Supporting Affidavit are, in fact, child pornography, "the judge must either view the images or rely on a detailed factual description of them"), citing New York v. P.J. Video, Inc., 475 U.S. 868, 873-74 (1986). As our Court of Appeals has advised, "[t]here are very few pictures of actual children engaged in sexual acts that are not child pornography, so it is unlikely the magistrate judge would have disagreed that the images constituted child pornography." Id., citing United States v. Koelling, 992 F.2d 817, 822 (8th Cir. 1993).

obtained from Yahoo, the Defendant's Internet Service Provider, and the motor vehicle records. We find nothing to dispute the unbroken chain of evidence which led to the Defendant's residence, as well as his computer, and accordingly, we find that there was a sufficient nexus, between the evidence of child pornography crimes, and the Defendant and his residence, to support a finding of probable cause. Compare, United States v. Chrobak, supra at 1044-1045 (finding sufficient nexus for a Warrant to search a suspected child pornographer's home, when the individual's name was connected to an online moniker that distributed child pornography, and law enforcement confirmed the address to which it was connected).

In sum, based upon the foregoing, it was entirely reasonable for the Judicial Officer to conclude that the images produced by Yahoo were child pornography, that the accounts belonged to the Defendant, and that, as a consequence, there was a fair probability that a search of his home would likely uncover evidence of crimes involving child pornography. Accordingly, we recommend that the Defendant's Motion to Suppress, insofar as it pertains to the first Search Warrant, be denied.

b) <u>The Second Search Warrant: The Yahoo Accounts</u>.

Next, the Defendant asks that we review the second Search Warrant, which was also issued on July 2, 2007, and which directed Yahoo to produce

information and records connected to the Yahoo account on which the child

pornography had been posted.  As with the first Search Warrant, no challenge has

been made as to the execution of the Warrant, and accordingly, we focus our attention

on the "four corners" of the Warrant, in order to determine whether probable cause

was shown for its issuance, or if any fatal defect would justify the suppression of the

evidence secured by its execution.[6]

------

[6]The Defendant has not argued that the issuance of the second Search Warrant
violated the Electronic Communications Privacy Act ("ECPA"), see Title 18 U.S.C.
§§2701-2711, nor are we able to identify any such violations.  Pursuant to Section
2703, the Government may obtain a Search Warrant requiring third party email
service providers, and Internet Service Providers, to disclose the content of stored
communications, and other transactional and subscriber data, without notice to the
subscriber.  Id.

    In addition, we are mindful that the second Search Warrant was issued by a
Magistrate Judge, who was located in this State and District, which authorized the
search and seizure of electronic communications, and evidence, that was stored
outside of this District.  However, the ECPA authorizes Courts to issue Search
Warrants for electronic communications, and evidence, that are located in other
Districts, where that Court has jurisdiction over the offense under investigation.  See,
Title 18 U.S.C. §2703(a)(providing that a Search Warrant for electronic
communications in electronic storage may be issued only "by a court of competent
jurisdiction.");  Title 18 U.S.C. §2711(3)(A)(i)(defining a "court of competent
jurisdiction" as a District Court that "has jurisdiction over the offense being
investigated"); see also, United States v. Kernell, 2010 WL 1408437 at *1 (E.D.
Tenn., April 2, 2010)("[T]he statutory language of 18 U.S.C. §2703 specifically
authorizes the issuance of [search warrants for electronic communications and
evidence to be executed out of the district].", Report and Recommendation adopted
(continued...)

As to the issue of staleness, our previous analysis, as well as the conclusion we reached as to the first Search Warrant, applies equally to the second Search Warrant, since both Warrants were issued in connection with the same factual basis.  We recognize that a period of approximately seven (7) months elapsed, between the receipt of the information connecting the Yahoo account to child pornography, and the Application for the second Search Warrant.  Nevertheless, Ball averred that communications, and files, that are stored in a subscriber's Yahoo account, may remain on the server indefinitely, if the subscriber does not delete the files, or exceed storage limitations, and if the subscriber logs into the account periodically, or if those images are sent to another Yahoo user who does not delete them.  As we have already detailed, "the lapse of time is least important * * * when the [evidence of criminal activity] is not likely to be destroyed or dissipated."  United States v. Horn, supra 786, and it is well-established, in the applicable case law, that child pornography involves

[6](...continued)
by, 2010 WL 1491861 (April 13, 2010); In re Search of Yahoo, Inc., 2007 WL 1539971 at*5 (D. Ariz., May 21, 2007)("[T]he Court concludes that when Congress amended Section 2703(a) via Section 220 of the USA Patriot Act to add the phrase 'a court with jurisdiction over the offense,' Congress intended to authorize the federal district court located in the district where the alleged crime occurred to issue out-of-district warrants for the seizure of electronically-stored communications."); United States v. Berkos, 543 F.3d 392 (7th Cir. 2008)(same).

the kind of criminal activity in which the evidence, or contraband, is unlikely to be discarded. See, e.g., <u>United States v. Shields</u>, 458 F.3d 269, 279 n. 7 (3rd Cir. 2006) ("We have noted that collectors of child pornography often store their material and rarely discard it."). Accordingly, we conclude that, like the first Search Warrant, the information that formed the basis for the second Search Warrant was not impermissibly stale.

Moreover, viewed in totality, the averments that were contained in Ball's Affidavit presented the issuing Judicial Officer with a fair probability that evidence of criminal activity, which was related to child pornography, would likely be found in the Yahoo accounts, and the other requested records. Yahoo reported that the user of the account had posted digital files containing child pornography, and the Government confirmed that those files contained images of known child victims who were engaged in sexually explicit conduct. Those observations provide a sufficient nexus, between the child pornography and the Yahoo account, to warrant a search. The Defendant draws no other constitutional deficiency in the Warrant to our attention, and our independent review has failed to uncover any. Consequently, we conclude that the Defendant's Motion to Suppress evidence, which was obtained as

a result of the second Search Warrant, is also without merit, and we recommend that the Motion be denied.[7]

      B.    <u>Motion to Suppress Statements, Admissions and Answers</u>.

      1.    <u>Standard of Review</u>.  Government agents are not required to administer <u>Miranda</u> warnings to everyone they question.  See, <u>Oregon v. Mathiason</u>, 429 U.S. 492, 494-495 (1977).  Rather, <u>Miranda</u> warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'"  <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994), quoting <u>Miranda v. Arizona</u>, supra at 444; <u>United States v. Helmel</u>, 769 F.2d 1306, 1320 (8th Cir. 1985); <u>Berkemer v. McCarty</u>, 468 U.S. 420, 428-29 (1984).  Once a suspect is in police custody and subject to interrogation, the suspect must be informed of his constitutional right to remain silent, and to be represented by legal counsel during questioning.  See, <u>Miranda v. Arizona</u>, supra at 473; see also, <u>Dormire</u>

---

[7]Even if the information in both the first and second Search Warrants had been insufficient to establish probable cause, or was impermissibly stale, we would be compelled, by the law of this Circuit, to find that the officers' reliance upon the Search Warrants was reasonable, because neither of the Warrants was "so facially lacking in probable cause as to preclude the executing officers' good faith reliance thereon." <u>United States v. McNeil</u>, 184 F.3d 770, 775 (8th Cir. 1999), citing <u>United States v. Leon</u>, 468 U.S. 897, 922-23 (1984).

v. Wilkinson, 249 F.3d 801, 803-804 (8th Cir. 2001), cert. denied, 534 U.S. 962 (2001).

"In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Stansbury v. California, supra at 322, quoting California v. Beheler, 463 U.S. 1121, 1125 (1983). As the Court in United States v. Griffin, 922 F.2d. 1343, 1347 (8th Cir. 1990) stated: "[i]f [the Defendant] believed his freedom of action had been curtailed to a 'degree associated with formal arrest,' and that belief was reasonable from an objective viewpoint, then [the Defendant] was being held in custody during the interrogation." See also, Stansbury v. California, supra at 322; United States v. Chamberlain, 163 F.3d 499, 502 (8th Cir. 1998).

Under the law of this Circuit, the relevant factors, which are to be considered in making a determination of custody, include an accused's freedom to leave the scene, and the purpose, place, and length, of the interrogation. See, United States v. Griffin, supra at 1348-49. The most comprehensive list of factors was enumerated, as follows, in United States v. Griffin, supra at 1349:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

See also, United States v. Ollie, 442 F.3d 1135, 1137 (8th Cir. 2006); United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004), cert. denied, 544 U.S. 1060 (2005); United States v. Axsom, 289 F.3d 496, 500-501 (8th Cir. 2002).

The Court has regarded the first three (3) of the Griffin factors as mitigative in their effect upon the ultimate determination, for the presence, during the questioning, of one or more of those factors tends to weigh against a finding of custody. On the other hand, the remaining three factors have been characterized as coercive in their effect, since those factors would tend to accentuate the existence of custody. Notably, these factors "are by no means exhaustive and should not be applied ritualistically, counting indicia which contribute to custody against those which detract." United States v. Brave Heart, 397 F.3d 1035, 1039 (8th Cir. 2005), citing United States v. Czichray, supra at 827. Instead, the Griffin factors serve as a guide in the resolution of the

ultimate inquiry of "whether the defendant was restrained as though he were under formal arrest." United States v. Czichray, supra at 828.

In addition to whether or not Miranda is implicated, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination. See, Dickerson v. United States, 530 U.S. 428, 433-34 (2000). For a confession to be considered voluntary, a Court must examine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." Id. at 434, citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

As the Supreme Court has explained:

> The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." [Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)] See also Haynes [v. Washington, 373 U.S. 503, 513] (1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962); Reck v. Pate, [367 U.S. 433, 440] (1961)("[A]ll the circumstances attendant upon the confession must be taken into account"); Malinski v. New York, [324 U.S. 401, 404] (1945) ("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant"). The determination "depend[s] upon

> a weighing of the circumstances of pressure against the power of resistance of the person confessing." Stein v. New York, [346 U.S. 156, 185] (1953).

Id. at 434.

Among the circumstances, which are to be considered in this analysis are, first and foremost, whether a Miranda warning has been given, see, Withrow v. Williams, 507 U.S. 680, 693 (1993); any elements of "police coercion" or overreaching, see, Colorado v. Connelly, 479 U.S. 157, 163-164(1986); the length of the interrogation, see, Ashcraft v. Tennessee, 322 U.S. 143, 153-154 (1944); the location of the interrogation, see, Reck v. Pate, 367 U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, Leyra v. Denno, 347 U.S. 556, 561 (1954); the capacity of the defendant to resist pressure or exercise free will, see, United States v. Larry, 126 F.3d 1077, 1079 (8th Cir. 1997); see also, Withrow v. Williams, supra at 693-694 (listing the applicable considerations). Lastly, the Government has the burden of proving, beyond a preponderance of the evidence, that a statement was voluntary. United States v. Wright, 706 F.2d 828, 830 (8th Cir. 1983)

      2.    Legal Analysis. The Government has acknowledged that the Defendant was not advised of his Miranda rights, at any time prior to, or during, the interview. In addition, we accept, given that there is no evidence to the contrary, that

the Defendant's statements were made in response to direct questioning by law enforcement officials. Accordingly, the pertinent inquiry is whether the Defendant was in custody, so as to require a <u>Miranda</u> warning and, if not, whether his statements were otherwise involuntary.

Turning to the first <u>Griffin</u> factor, our Court of Appeals has advised that, "[w]hile advising someone that he or she is not under arrest helps to mitigate an interview's custodial nature, an explicit assertion that the person may end the encounter is stronger medicine," and "[s]uch a statement provides an individual with a clear understanding of his or her rights and generally removes any custodial trappings from the questioning." <u>United States v. Ollie</u>, supra at 1138, citing <u>United States v. Czichray</u>, supra at 826. Here, it is undisputed that Ball advised the Defendant that he was under no obligation to speak with law enforcement agents, and that he was free to leave, or terminate the interview at any time, thereby providing strong support that the Defendant was not in custody for purposes of <u>Miranda</u>. Moreover, there is no suggestion that the Defendant's freedom of movement was restrained in any way, which provides further support for the conclusion that the Defendant was not in custody. Notably, the Defendant was not handcuffed, and the

interview took place in the living room of the Defendant's own personal residence, rather than in a law enforcement facility.

Turning to the remaining <u>Griffin</u> factors, we find that there is also no evidence that Ball, or any other agent assisting him, employed coercive or deceptive strategies. Indeed, Ball testified that the agents did not raise their voices, that they did not make any promises, that they did not threaten the Defendant, that the interview was conversational in tone, and that the interview lasted less than half an hour. We further note that, at the end of the interview, the Defendant was not placed under arrest, nor is there any indication that Ball intended to arrest the Defendant. See, <u>United States v. Sutera</u>, 933 F.2d 641, 647 (8th Cir. 1991)(noting that "it is very important that the officers did not contemplate arresting [the defendant]," which indicates that the interview was just a part of the investigation). Given the circumstances surrounding the questioning of the Defendant, we are persuaded that the Defendant was not in custody, at any time during the interview, for purposes of <u>Miranda</u>.

While we recognize that there were five (5) law enforcement agents in the home, at the time of the interview, only two (2) agents participated in the interview of the Defendant. Our Court of Appeals has noted that, where the questioning of a

defendant is conducted "in the comfort and familiarity of his home," it is less likely that a defendant will be deemed to have been in custody, notwithstanding the presence of several law enforcement agents.  United States v. Axsom, supra at 502 (interview was not custodial despite the presence of nine  (9) agents, where only two (2) agents participated in the interview, the evidence reflected a "more casual scene," and the interview was conducted in the defendant's home); see also, United States v. Rorex, 737 F.2d 753, 756-757 (8th Cir. 1984)(questioning was not custodial interrogation where it was conducted in the defendant's office while his place of business was being searched).

As our Court of Appeals has explained:

> [Oregon v. Mathiason, 429 U.S. 492, 495 (1977)]  and [California v. Beheler, 463 U.S. 1121, 1125 (1985)] teach us that some degree of coercion is part and parcel of the interrogation process and that the coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart.

United States v. LeBrun, 363 F.3d 715, 721 (8th Cir. 2004), cert. denied, 543 U.S. 1145 (2005).

We are mindful that all of the agents were likely armed, but there is no suggestion that any weapons were drawn or brandished at any point, or that the weapons were

otherwise the focus of any concern expressed by the Defendant. Accordingly, given the absence of the usual attributes of custody, we are persuaded that the presence of the five (5) armed law enforcement agents in the home, during the interview, did not serve to convert the interview into a custodial interrogation, since no reasonable person could have believed that his freedom to depart was restrained, given the totality of the circumstances. See, United States v. Black Bear, 422 F.3d 658, 663 (8th Cir. 2005)(defendant not in custody where police-domination did not result in the kind of restraint on movement associated with formal arrest).

Nor are we persuaded that the Defendant otherwise invoked his right to counsel, or implicitly requested that the interrogation cease, by asking whether he should consult with an attorney. Notably, even where a Defendant is found to be in custody for Miranda purposes, in order to invoke the right to counsel, a suspect's request must be unambiguous, and unequivocal. See, Davis v. United States, 512 U.S. 452, 461-462 (1994). In order for a suspect's request to be unequivocal, a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable officer in the circumstances would understand the statement to be a request for an attorney." Id. at 459.

In <u>Davis v. United States</u>, the Supreme Court held that the statement "maybe I should talk to a lawyer," was equivocal. <u>Id.</u> at 455; see also, <u>United States v. Kelly</u>, 329 F.3d 624, 630 (8th Cir. 2003)(finding the statement "do you know any good attorneys?" insufficient to invoke the defendant's right to counsel); <u>Dormire v. Wilkinson</u>, supra at 805(finding that the statement "could I call my lawyer," which was made immediately after the defendant had asked to call his girlfriend, was not an unequivocal request for counsel); <u>United States v. Ramirez</u>, 2002 WL 31933026 at *7-8 (S.D. Iowa, April 16, 2002)(holding that the defendant's question as to whether a police officer thought that the defendant needed an attorney was equivocal).

Furthermore, in <u>Davis</u>, the Supreme Court declined to adopt a rule requiring interviewing officers to ask clarifying questions following an equivocal invocation of counsel. As the Court explained:

> Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney. * * * Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel. But we decline to adopt a rule requiring officers to ask clarifying questions.

<u>Id.</u> at 461.

Here, the Defendant asked if he should seek an attorney, and Ball responded that he could not give the Defendant legal advice. At that time, the Defendant did not ask for an attorney and, according to Ball, the Defendant indicated that he was willing to continue with the questioning. Given those undisputed facts, we conclude that the Defendant's question did not constitute an unequivocal invocation of his right to counsel. Nor can we responsibly find that the Defendant's question converted an otherwise noncustodial interrogation into custodial questioning, as there is no evidence that the Agents denied the Defendant access to a lawyer, or in any way suggested that he was not free to seek the assistance of counsel, or to terminate the questioning, at that time, such that his question would impact upon the custodial nature of the interview.

Lastly, based mainly upon the same factors, we also find that the Defendant's statement was voluntary, since there is nothing to suggest that his statement to law enforcement was anything other than the direct result of his own election to cooperate. As noted, the Record reflects that the Defendant was advised that he was free to leave at any time, and that he was not handcuffed, or otherwise restrained. Notably, there is also no evidence that the Agents engaged in coercive conduct during the course of the interview. As previously detailed, none of the agents made any promises to the

Defendant, or threatened him in any way, and there is no evidence that the Agents somehow duped the Defendant into answering their questions. Indeed, Ball told the Defendant that he was not obligated to cooperate, and that he could cease the interview at any time. Furthermore, the evidence demonstrates that the Defendant was not denied any of the normal accommodations of daily living, and that the general tenor of the interview was conversational in nature.

Ball testified that the Defendant appeared to understand what was happening, and what they were asking him, and there is no evidence to suggest the existence of any physical, or mental impairments, that would impact upon the voluntariness question. Certainly, the length of the interview -- less than a half an hour -- was not unduly burdensome. We are mindful that Ball testified that the Defendant appeared to be nervous, and somewhat distressed when he said "I just hung myself," but that does not change the voluntary nature of the Defendant's agreement to cooperate. Quite notably, the Defendant fails to support his assertion, that his statement was involuntary, with any specific, and evidence-based, demonstration of coercion, and our review of the Record has found none.

Accordingly, we find that the interviewing Agents did not engage in coercive conduct, much less conduct sufficient to have overborne the Defendant's will. As we

have detailed, the Defendant's interview was plainly the product of his election to cooperate with law enforcement and, as a consequence, we recommend that the Defendant's Motion to Suppress Statements be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1.     That the Defendant's Motions to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 25] be denied.

2.     That the Defendant's Motion to Suppress Statements, Admissions, and Answers [Docket No. 26] be denied.

Dated:  May 13, 2010                           *s/Raymond L. Erickson*
                                               Raymond L. Erickson
                                               CHIEF U.S.  MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than May27, 2010**, a writing which specifically identifies those portions of

the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than May 27, 2010,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.